UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

RONNIE EVAN COUBERT,          )
                             )
     Plaintiff,              )     Civil No. 3:15-CV-00025-JMH
                             )
V.                           )
                             )     **MEMORANDUM OPINION**
CAROLYN V. COLVIN,           )        **AND ORDER**
ACTING COMMISIONER OF        )
SOCIAL SECURITY              )
                             )
     Defendant.              )

              ****    ****    ****    ****

     This matter is before the Court upon cross-motions for

summary judgment on Plaintiff's appeal of the Commissioner's

denial of his application for Supplemental Security Income

benefits. [Record Nos. 12, 13][1]

                             **I.**

     Plaintiff filed an application for Supplemental Security

Income benefits on May 3, 2012 [Administrative Record

(hereinafter, "AR") at 191].  He was forty at the time of his

application and had completed 11th grade but had not obtained a

GED [AR 28, 245, 430].[2]  His past work history included

employment as a kitchen helper or busboy, dishwasher, and

---

[1] This is not a traditional Rule 56 motion for summary judgment. Rather, it is
a procedural device by which the parties bring the administrative record
before the Court.
[2] An examining psychologist noted that Plaintiff had completed high school and
earned a diploma [AR at 249], but the ALJ issued a decision which relied on
Plaintiff's statement about the highest degree of education obtained [AR at
28].

grocery stock worker [AR at 84-85, 391-99]. Plaintiff alleged the onset of disability on March 11, 2009, due variously to dementia, obesity, shoulder, back, neck, neck, and ankle problems, deafness in one ear, vision problems, high blood pressure, mobility and breathing problems, blackouts, spontaneous toe bleeding, memory problems, swelling in his legs and ankles, and chronic pain. Plaintiff's application was denied upon initial application and upon reconsideration [AR at 97-111, 112-27]. Plaintiff has not engaged in substantial gainful activity since his application date, May 1, 2012 [AR at 28.] Rather, he reports that he sits around the house where he lives with his mother, looking out of the window, that he is depressed, and that he has no social life and no friends. He enjoys coloring and doing puzzles, and he watches six to seven hours of television a day.

The evidence in the administrative record demonstrates that Plaintiff has not sought regular care with a treating physician. Rather, the bulk of his treatment appears to come from emergency room visits and referrals following those visits. He claims that he has been unable to work due to pain that he has experienced in both knees since a motor vehicle accident in March 2009, when another car struck the car that he was driving on the driver's side of the car. He now wears braces on his knees and began using a cane after the accident. He has also

been prescribed a walker for balance. He claims, as well, that he suffered brain damage as a result of the accident and that, at about the same time, his right foot became crooked and swells. He also alleges that he experiences back pain.

Since it is a touchpoint for everything which follows, the Court first notes the emergency treatment records from the Frankfort Medical Center on March 11, 2009, where Coubert presented after the motor vehicle accident [AR at 416-21]. These records show that he complained of pain in the left shoulder, left leg, left knee, and low back as the result of the automobile accident. An examination revealed Plaintiff had contusions on his left knee and shoulder. Plaintiff did not have any evidence of trauma to his head and was alert, oriented, and could obey commands during the examination. He was able to move all of his extremities, and did not complain of trouble breathing. Plaintiff's cervical and lumbar spine, shoulder, and knee were X-rayed. X-rays of his spine were negative for fracture, and x-rays of his knee and left shoulder were normal. He underwent physical therapy after the accident for his left shoulder, knee, and with respect to cervical spine range of motion [AR at 504-22]. His functional ability score on May 1, 2009, was 27/27 [AR at 504]. Having met all of the goals for physical therapy, he was then discharged from further treatment [AR at *id*.].

On February 17, 2010, Plaintiff was examined by an agency consulting physician, Dr. W.R. Stauffer [AR at 422-429]. Plaintiff complained of a history of back pain and problems with his left knee and ankle, which caused him difficulty standing and walking, arising out of or worsened by his March 2009 motor vehicle accident. Plaintiff also complained of breathing problems, and claimed that he had dyspnea after walking more than 20 feet. Upon examination, Dr. Stauffer found Plaintiff had some tenderness in his cervical and lumbar spine. Plaintiff also had a straight leg raise of 70 degrees, bilaterally, associated with low back pain. He observed that Plaintiff used a cane. Dr. Stauffer found a decrease in Coubert's bilateral shoulder flexion and abduction to 100 degrees each, as well as a decrease in cervical spine extension and bilateral cervical spine rotation to 60 degrees bilaterally, and a decrease in lumbar spine flexion to 60 degrees. Dr. Stauffer observed that Plaintiff's gait and station were mildly antalgic without a cane, but he did not think the cane was necessary for minimum ambulation. Plaintiff's motor strength in his extremities was 5/5. Plaintiff's sensation was intact upon examination, and Dr. Stauffer observed that Plaintiff could perform both manipulation and gross dexterous movements with his hands. Plaintiff reported to the examiner that he could not knee squat or walk on his heels or toes. Dr. Stauffer observed deep tendon reflexes

which were 2+ and symmetrical and that Plaintiff had a positive axial load test, "which is sometimes associated with exaggeration of symptoms." Coubert's mental status was normal.

Dr. Stauffer assessed Plaintiff with chronic back and leg pain, obesity, decreased visual acuity, hypertension, possible mild chronic obstructive pulmonary disease, and a history of left shoulder supraspinatus tendinopathy. While recognizing that the Plaintiff "basically seems to hurt all over," Dr. Stauffer stated that he felt that the Plaintiff was exaggerating his symptoms from the outset and in the office, particularly in light of the positive axial load test. Dr. Stauffer concluded that Plaintiff could lift 10 pounds frequently; lift 20 pounds, push or pull, balance, kneel, or crouch occasionally; and stand or walk six hours in an 8-hour day with normal breaks. He noted that Plaintiff might have some difficulty climbing a ladder, rope, or scaffold, or repetitively reaching overhead, but found that Plaintiff did not have any visual, communicative, or environmental limitations.

A consultative Mental Status Evaluation Report was completed on February 25, 2010, by Lyle Carlson, Ph.D. [AR at 430-33]. Dr. Carlson met with Plaintiff for an examination and found that he had poor grooming and levels of hygiene, atypical gait and poor posture, and that he used a cane but that he evidenced a euthymic mood. Plaintiff reported significant

levels of depression and that he had never received behavioral healthcare. Coubert also advised that he had been in five to six automobile accidents over the ten years prior to the examination and that he had experienced poor memory and concentration, back and neck pain, black outs, dizziness, breathing problems, and poor balance since the accident in March 2009. Nonetheless he told Dr. Carlson that he had driven himself and his mother to the assessment and that he took over-the-counter pain medication to manage back and leg pain. Dr. Carlson administered a valid and reliable test of effort which indicated that Plaintiff did not put forth sufficient effort to interpret the other assessment results without warning. He reported that the test results showed, at best, the examinee's minimal abilities and that Coubert's true level of functioning was unknown at that time.

Dr. Carlson reported that Plaintiff was appropriately oriented during the assessment but that his thought content was "atypical with evidence of delusions" and that he required frequent redirection to stay on task during the assessment. Notably, Coubert made odd statements about Elvis Presley living in Florida and riding a motor cycle to Kentucky to visit him. He also shouted "chili dogs" several times during the assessment. As a result of the poor results on the valid and reliable test of effort, Dr. Carlson felt that it was "likely

that Mr. Coubert was attempting to over represent his cognitive and psychological difficulties." The assessment revealed intact recent and remote memory. Dr. Carlson feared, however, that Plaintiff was intentionally giving false information in response to inquiries into his fund of information (misidentifying the colors of the American flag, for example, while accurately defining the word "hieroglyphic" and correctly identifying the author of *Hamlet*). Dr. Carlson also reported that Coubert gave responses during the assessment and clinical interview which reflected poor insight and judgment, impaired working memory (inability to correctly count backward from 20 to 0 or to recall 4 digits forward and 2 digits backward), and that his ability for abstraction seemed poor and incongruent with his level of education.

Coubert reported to Dr. Carlson that he was able to manage fundamental tasks of daily living without assistance but not the instrumental tasks (managing household chores, personal finances, and keeping important appointments) and that he gets along well with others. Dr. Carlson noted that, if Plaintiff's performance during the assessment was accurate, then he would likely have difficulty coping with job-related stress and interpersonal interactions due to impaired cognitive abilities. However, Dr. Carlson declined to offer a diagnostic impression with respect to depression due to Coubert's poor performance on

the test of effort, his inconsistent performance throughout the assessment, and the demonstration of odd behavior inconsistent with his injuries. He did suggest that Coubert was likely experiencing "some level of mood disruption that is often comorbid with physical pain and loss of functioning (some loss of mobility)" as a result of his injuries from the automobile accident reported but that there was no medical record to confirm the type of traumatic brain injury that Coubert claimed to have experienced. He opined that Coubert's I.Q. could fall in the range of low average to borderline intellectual functioning based on Coubert's report of his academic experience, but that simply looking at his past history of steady employment performing simple tasks would suggest that he could function adequately in a work environment with low stress levels and significant supervision.

Based on the evidence then-to-date, a non-examining agency reviewer, Carole Rosanova, M.D., found no medically determinable impairment based on her review of the assessments from March 11, 2009 to May 11, 2010, on a Psychiatric Review Technique form dated May 11, 2010 [AR at 434-46.] Another non-examining agency medical consultant, Raymond Eastridge, completed a Physical Residual Functional Capacity Assessment dated May 12, 2010, in which he assessed Plaintiff's reported physical limitations and pain as "partially credible" in light of medical evidence solely

of decreased range of motion in the lumbar spine, 5/5 strength, full sensation, reflexes, and positive axial load test [AR at 448-55.] He opined that Plaintiff could lift and carry 50 pounds occasionally, frequently lift and carry 25 pounds, stand or walk 6 hours in an 8 hour workday, sit with normal breaks for 6 hours in an 8 hour workday, and engage in unlimited pushing and pulling or operation of hand and foot controls, but never balance and never climb ladders, ropes, or scaffolding, citing the findings and observations in Dr. Stauffer's report, as well as past medical records and diagnostic findings. He assessed Plaintiff with no manipulative limitations, no communicative limitations, no environmental limitations, but with visual limitations for limited far acuity.

Dr. Carlson examined Plaintiff again on July 28, 2010 [AR at 456-62]. He advised that "Coubert did not put forth sufficient effort to interpret the assessment results without warning" and that his "performance on tests of effort fell far below chance (meaning that random responding or guessing would have produced higher scores) and was far below what would be expected even from individuals exhibiting major depression, neurological impairment, moderate to severe brain injury, and other clinical diagnoses." Dr. Carlson ultimately observed that Coubert's "true level of functioning is unknown at this time."

Based on his performance on the WISC-IV, Dr. Carlson initially assessed Coubert with a full scale I.Q. of 48, meaning that his overall intellectual ability would be in the "extremely low" range, if the results were believed. Coubert's score on the WRAT4, administered to assess basic academic skills, was in the "Lower Extreme" with a standard score of 55. He had a score of 91, in the clinical range, on the Achenbach Adult Self-Report for Ages 18-59, used to measure severity of disturbance in mental health patients. While Dr. Carlson felt that Coubert was oriented with respect to place, purpose, and name during the clinical interview, Coubert also reported that he was unaware of the then-current date or year, his own age, or his date of birth. Dr. Carlson noted Coubert's difficulty with staying on task through the course of the assessment, as well as his child-like manner, and poor judgment and insight. While Dr. Carlson noted no significant discrepancies between Coubert's scores on intellectual and academic testing and his full scale intelligence quotient of 48, he observed that the level of impairment suggested by both measures would usually be seen in individuals with moderate mental retardation. However, Coubert was inconsistent in his responses, and Carlson described how Coubert would miss easy items but generate a word like "utensil" to describe a fork. He observed that the results from measures of psychological adjustment and adaptive behavior indicated

extreme levels of psychopathology that would generally warrant inpatient psychiatric care. Ultimately, he noted that, while there might be "some level of real impairment[,] his poor performance on effort testing precludes any diagnosis of cognitive dysfunction" and reported him as malingering or over representing his psychopathology. Dr. Carlson assessed a GAF of 62 based mainly on Coubert's self-report of symptoms and behaviors but ultimately concluded that it was impossible to make a prognosis "given that Mr. Coubert's approach to testing was such that he blatantly over represented his psychopathology."

In a subsequent Psychiatric Review Technique, dated September 7, 2010, Mary K. Thompson, Ph.D., concluded that there was "no medically determinable impairment" and wrote that the claimant's statements concerning disabling conditions were "not credible" in light of his odd behavior during examinations which was inconsistent with the type of injuries and physical trauma that he had reportedly experienced, as well as in light of his poor effort and past diagnoses of malingering [AR 463-76]. A second Physical Residual Functional Capacity Assessment prepared by medical consultant Leisa Beihn, M.D., on September 7, 2010, [AR at 477], assessed Plaintiff with the ability to occasionally lift or carry 50 pounds, frequently lift or carry 25 pounds, stand for 6 hours in an 8-hour workday, sitting for 6 hours in

an 8-hour workday, unlimited pushing and pulling, including operation of hand or foot controls.

Another agency consulting physician, Dr. Robert Nold, completed a physical examination of Coubert on July 26, 2012. [DE 485-89.] Relying, in part, on Plaintiff's self-reported history, he opined that Plaintiff's ability to move his neck was severely limited and recorded observed deformity of Plaintiff's right ankle with 1+ edema in both lower extremities, limitation of motion in both shoulders as well as both knees, hips, back, and ankles. [AR 487.] He opined that Plaintiff was limited to a 2/5 bilateral fist grip and that he did not believe Plaintiff could "perform fine manipulation and [that] the gross dexterity of his upper extremities is significantly limited." [AR at 487.] Dr. Nold noted that Coubert could not get onto the table to perform a straight leg raising test and that Plaintiff used a cane, reportedly prescribed by his physician, which was necessary due to his unsteady gait and poor equilibrium. Finally, he noted that Plaintiff reported diminished hearing in his left ear and observed that he had impaired visual acuity in both eyes with corrective lenses based on the Snellen exam. Nold made no observation of malingering and reported that he felt that Coubert was mildly confused as far as dementia, secondary to the blunt force trauma reportedly experienced in an automobile accident. He observed that, although Plaintiff had a

normal x-ray of the knee, he reported pain in both knees, wore a brace on the right knee, and had a limited range of motion of the right knee. He reported that, by observation, Plaintiff's right ankle was deformed, making it difficult for him to walk.

In his report of an agency consultative examination on September 6, 2012, James. W. Matthews, M.D., reported that Plaintiff had described the March 2009 accident and claimed that he had forcefully hit the steering wheel and suffered a fractured cervical vertebrae and blurred vision since the time of the accident. [AR 492-97] Claimant complained to Dr. Matthews of daily sharp, burning headaches, dizziness, and blackouts. Dr. Matthews ultimately assessed Plaintiff with myopia and found no pathology to account for visual field abnormalities, which he theorized might be due to nonorganic causes.

Shirley A. Settles, Ph.D., performed a consultative examination on April 4, 2012. [AR at 647-52.] Dr. Settles wrote that Coubert complained of depression, anxiety, and a host of medical problems arising out of the 2009 automobile accident. He advised her that he was deaf in one ear, could not lift his left arm, suffered from sharp pains in his leg, could not walk well, and had broken vertebrae in his back. Coubert estimated that he had blackouts one to two times a day, in which his vision went black but he did not lose consciousness. He also

reported a 2009 diagnosis with "Asperger's Disorder" by his attending physician and a 2011 diagnosis with pleurisy, resolved with medication.  She also noted that he told her that he had graduated from high school.  Dr. Settles observed that Plaintiff exhibited no evident lack of effort during the exam and concluded, based on the testing that she conducted, that Plaintiff had a full-scale IQ of 67, indicative of an extremely low range of intellectual functioning.  She also observed that he functioned at a second grade level in math and a fourth grade level in reading and would have "significant difficulties completing consecutive tasks compared to his peers."  She noted, however, that Coubert did not have the severe adaptive functioning deficits associated with "mental retardation" which could be indicated by a full scale I.Q. below 70.  She concluded that, because of his good adaptive functioning skills, it was more likely that he had Borderline Intellectual Functioning which may have, itself, been influenced by injuries from the automobile accident in 2009.  She referred to his extremely low scaled score on the Digit Span subtest as a measure to detect potential brain damage and observed that he had significant difficulty retaining information in his mind and could not perform multiple operations at once.

She also reported on his completing of the Personality Assessment Inventory, noting that he invalidated the measure due

to his extreme score on the Infrequency Scale, indicating odd interests and activities against the norm which may signify abnormal behavior or psychopathology. She noted, as well, that he endorsed the Positive Impression Management scale at a level significantly higher than average adults and that his raw score was one point away from invalidation, indicating that he was unwilling to report even minor faults. She felt that it indicated poor insight into his problems and possibly a misunderstanding of some questions due to cognitive deficits. She felt that his endorsement of somatic complaints and symptoms of depression on other clinical scales were consistent with his report during the clinical interview.

Meanwhile, Coubert sought treatment at and was released from the Frankfort Regional Medical Center on August 20, 2010, for a complaint of a swollen face [AR at 500]. He was assessed with a periodontal abscess and dental cavities [AR 501]. On February 13, 2012, Coubert sought treatment at the Frankfort Medical Center for "pleuritic left-sided chest pain", which he had felt intermittently secondary to coughing since February 4, 2012 [AR at 534-42.] At the time he reported no asthma, congestive heart failure, chronic renal insufficiency, coronary artery disease, dementia, depression, fractures, seizures, or any other relevant medical history [AR at 534]. He was

discharged after a chest x-ray that was negative for pulmonary disease.

He again sought treatment on October 1, 2012, explaining that he had experienced back or pleuritic pain for the past month and that he had blacked out for twenty minutes after sitting down on the bed while putting clothes away [AR at 544-45]. He advised that he had then fallen off his bed and suffered an instance of urinary incontinence and numbness in his left arm. [AR at 544.] During the examination, he stated that he was unable to catch his breath and that his head hurt. His blood work and chest x-ray were unremarkable, but he left the hospital against medical advice to attend a probation meeting [AR at 542, 552].[3] He sought treatment for chest pain on October 4, 2012 [AR at 552], having taken some nitroglycerin which he found in the hospital during his prior visit and which he thought was being prescribed and given to him [AR at 552]. After ruling out a myocardial infarction, an echocardiogram showed questionable mild basal anteroseptal hypokinesis. An October 8, 2012, catheterization was unremarkable. After some time, on September 23, 2013, Plaintiff again sought treatment for chest pain, as well as abdominal pain and bright red blood in his stool. Diagnostic imaging of chest, abdomen, and pelvis

_____

[3] As the ALJ explained in his decision, Plaintiff is a convicted sex offender who has pleaded guilty to two felony child sex abuse charges and was sentenced to four years of probation.

revealed no acute disease [AR at 634-37]. He was assessed with occult blood and advised to follow up with Dr. John Shekelton [AR at 643]. Finally, he was seen by Dr. Ganesh Yamraj on January 10, 2014, complaining of "pain all over." [AR at 655.] After observing issues with Coubert's range of motion and diffuse tenderness all over Plaintiff's body and with every movement, Dr. Yamraj prescribed a wheeled walker for Coubert due to "leg weakness. [AR at 655-56.] Coubert signed for the walker on February 25, 2014 [DE 656]. A printout dated April, 11, 2014, indicates that Plaintiff was taking several medications for his symptoms, including Naproxen, Symbicort, Ventolin, Ibuprofen, and Nitrostat. [AR at 17.]

Upon Plaintiff's request, a hearing on his application was conducted on February 20, 2014, before Administrative Law Judge ("ALJ") Ronald M. Kayser [AR 156-160.] Plaintiff was present and testified at the administrative hearing on February 20, 2014. When asked what particular medical issues would keep him from performing work similar to his previous employment, Plaintiff testified that he was having bad pain in both of his knees [AR at 56]. He stated that he had injured his knees and back in a motor vehicle accident in 2009 and that now needed to wear braces to alleviate some of the pain. [AR at 56, 58.] However, Plaintiff stated that these devices were not prescribed by a doctor and that the walker he brought to the administrative

hearing was borrowed from his mother. [AR at 59-60.] Plaintiff also testified that he has limited use of his left arm, which impairs his ability to lift anything heavier than a coffee cup. [AR at 68.]

Plaintiff testified regarding the pain in his knees, stating that his knee pain was 10/10 and that taking ibuprofen temporarily reduced his pain to a 7/10 [AR at 69-71]. Plaintiff maintained that his pain rose to the level of 10/10, even though the ALJ explained that such a rating would be the equivalent of holding one's hand in an open fire [AR at 70].[4] The Plaintiff was not receiving physical therapy or injections for his pain [AR at 77]. Plaintiff also testified that he suffered a head injury in the motor vehicle accident, which caused dementia [AR at 60-61]. However, the ALJ observed that medical records did not verify the occurrence of this, and he noted reports that Plaintiff malingered on memory tests with the Social Security Administration [AR at 61-62].[5] When questioned by the ALJ, Plaintiff denied that he was currently being treated for anything else. [AR at 63.]

---

[4] Upon questioning by his attorney, Plaintiff testified about other symptoms that he was alleging, including problems moving his neck and arms, blackouts, ulcers, incontinence, migraines, and reduced vision. [AR at 71-82.] However, Plaintiff stated that his vision was good enough to allow him to drive a car. [AR at 76.]

[5] Reports indicating that Plaintiff malingered on disability evaluations span at least 10 years. A February 16, 2006, report from the Department for Disability Determination stated that his functional capacity could not be determined due to his malingering. [AR at 408.]

Plaintiff testified about his activities of daily living, explaining that he lives with his mother in a one story house. [AR at 55.] He further stated that he had no social life and spends his days sitting around the house, often watching TV. [AR at 63.] However, Plaintiff stated that he mowed the lawn using a riding lawn mower, fed his mother's cats, and performed some of his personal hygiene, but that he did not cook or clean or do his own laundry [AR at 63-66]. He also drove a car and took it to have it washed [AR at 65-66].  He was able to dress himself "on the bottom part," but his mother washed his feet and washed his clothes, as well as helped him put on a shirt or a jacket "on the top part" [AR at 65.]

A vocational expert was also present and testified at the administrative hearing. [AR at 83-95.] The ALJ asked the vocational expert to assume a hypothetical individual of Plaintiff's age, education, and previous work experience, who had borderline intellectual functioning and could lift 20 pounds on occasion, lift 10 pounds more frequently, stand and walk six out of eight hours, sit six out of eight hours, with limited pushing and pulling, no climbing of ropes, scaffolds, and ladders, occasionally climbing ramps and stairs, balancing, kneeling, crouching, crawling, and stooping, all within a light range of work. The ALJ further limited the use of hazardous machinery and dangerous heights, provided for only occasional

bilateral overhead reaching but and frequent handling and gross manipulation. The ALJ indicated that the hypothetical worker would have moderate limitations or satisfactory ability to understand, remember, and carry out detailed instructions, respond appropriately to changes in the work setting, and set realistic goals or make plans independently. The ALJ further identified that the hypothetical individual would work best at repetitive one- or two-step work without production quotas and without the need for direct contract with the public or need for constant interaction with co-employees or supervisors. Using this hypothetical, the vocational expert concluded that such a person would not be able to perform any of Plaintiff's past work. With the limitations in the hypothetical question posed by the ALJ, the vocational expert identified unskilled, entry-level, light work available in the state and national economy including small product assembly and hand packaging.

Ultimately, the ALJ concluded that Plaintiff had severe impairments of obesity, osteoarthritis and allied disorders, borderline intellectual functioning, and affective disorder [AR at 28]. While the ALJ found that Plaintiff could not perform any of his past relevant work, he concluded that Plaintiff had the Residual Functional Capacity ("RFC") to perform light work with the limitations set forth in the hypothetical question

posed to the vocational expert [AR at 33-35].[6]     Thus, he
concluded that that Plaintiff could frequently handle
bilaterally; occasionally balance, stoop, crouch, kneel, crawl,
and climb stairs or ramps; and never climb ropes, ladders, or
scaffolds [AR at 33]. He also concluded that Plaintiff should
avoid hyperextension of his cervical spine and limit his
exposure to hazardous machinery and heights. [*Id.*]    Ultimately,
in light of the work available to someone with this residual
functional capacity based on the vocational expert's testimony,
he concluded that Plaintiff was not disabled.

Plaintiff's application was denied by the ALJ in a decision
dated March 14, 2014 [AR at 23-40.] The Appeals Council denied
Plaintiff's request for review on March 26, 2015, and the ALJ's
decision became the final report of the Commissioner. [AR at 1-
7.] Plaintiff has timely pursued and exhausted his
administrative and judicial remedies, and this matter is ripe
for review and properly before this Court under § 205(c) of the
Social Security Act, 42 U.S.C. §405(g). [*See* AR at 1-7.]

**II.**

The Administrative Law Judge ("ALJ"), in determining
disability conducts a five-step analysis:

---

[6] "Light work" is defined in 20 CFR 404.1567(b) and 416.967(b) as follows: the
ability to lift/carry 20 pounds occasionally and ten pounds frequently,
stand/walk up to six hours, and sit at least six hours in an eight-hour day.

1. An individual who is working and engaging in substantial gainful activity is not disabled, regardless of the claimant's medical condition.

2. An individual who is working but does not have a "severe" impairment which significantly limits his physical or mental ability to do basic work activities is not disabled.

3. If an individual is not working and has a severe impairment which "meets the duration requirement and is listed in appendix 1 or is equal to a listed impairment(s)", then he is disabled regardless of other factors.

4. If a decision cannot be reached based on current work activity and medical facts alone, and the claimant has a severe impairment, then the Secretary reviews the claimant's residual functional capacity and the physical and mental demands of the claimant's previous work. If the claimant is able to continue to do this previous work, then he is not disabled.

5. If the claimant cannot do any work he did in the past because of a severe impairment, then the Secretary considers his residual functional capacity, age, education, and past work experience to see if he can do other work. If he cannot, the claimant is disabled.

*Preslar v. Sec'y of Health and Human Services,* 14 F.3d 1107, 1110 (6th Cir. 1994) (citing 20 CFR § 404.1520 (1982)). "The burden of proof is on the claimant throughout the first four steps of this process to prove that he is disabled." [*Id.*] "If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Secretary." [*Id.*]

**III.**

In reviewing the ALJ's decision to deny disability benefits, the Court may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility. *Cutlip v. Sec'y of Health & Human Servs.,* 25 F.3d 284, 286 (6th Cir.1994). Instead, judicial review of the ALJ's decision is limited to an inquiry into whether the ALJ's findings were supported by substantial evidence, 42 U.S.C. § 405(g), *Foster v. Halter,* 279 F.3d 348, 353 (6th Cir. 2001), and whether the ALJ employed the proper legal standards in reaching his conclusion, *see Landsaw v. Sec'y of Health and Human Servs.,* 803 F.2d 211, 213 (6th Cir. 1986). "Substantial evidence" is "more than a scintilla of evidence, but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip,* 25 F.3d at 286.

**IV.**

Plaintiff argues that the ALJ erred in concluding that he was not disabled because (1) the ALJ improperly ignored the conclusions of examining agency physicians Doctors Nold and Settles, neither of whom concluded that Plaintiff was malingering during their evaluations, in favor of the opinions of non-examining agency physicians and (2) the ALJ incorrectly determined that he was not disabled under the criteria listed in listings 12.05C and 12.05D.  The Court has carefully considered

the evidence of record, the arguments presented by the
Plaintiff, and the Commissioner's response and concludes that
the decision of the Commissioner is supported by the evidence of
record and devoid of error which would necessitate remand or
reversal.

## A.

As an initial matter, the Court concludes that the ALJ
properly concluded, based on substantial evidence of record,
that Plaintiff retained the residual functional capacity to
perform a range of simple, light work. He did not err in
weighing the competing evidence from the various examining and
non-examining sources as Plaintiff complains. First, contrary
to Plaintiff's argument, the ALJ did not ignore the opinions of
agency examiners, Dr. Nold and Dr. Settles, who opined that
Plaintiff had severe physical and psychological impairment
without evidence of malingering. Rather, the ALJ engaged
meaningfully with the opinions of these physicians and looked to
evidence contained in the rest of the record

More to the point, the ALJ is not bound by the findings
made by a state agency medical or psychological consultant. 20
C.F.R. § 404.1527(e)(2)(i); *see* 20 C.F.R. §§ 416.927(d)(2),
416(d)(2) (stating that responsibility for determining residual
functional capacity of claimant is reserved to the
Commissioner). Rather, the ALJ considers numerous factors in

constructing a claimant's residual functional capacity, including the medical evidence, the non-medical evidence, and the claimant's credibility and evaluates the findings of a state agency professional in light of any other relevant factors. *See Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 443 (6th Cir. 2010); 20 C.F.R. §404.1527(e)(2)(ii). He must resolve conflicts in the evidence and incorporate only those limitations that he finds credible in the residual functional capacity assessment. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1234-35 (6th Cir. 1993).

In this instance, the ALJ considered all of the evidence, *including* the opinions of state examiners Nold and Settles [AR at 34-35], and concluded that Plaintiff's claims of disabling physical and mental limitations were not supported by that evidence. The ALJ discounted Plaintiff's credibility to a certain degree based on contradictions among the medical reports, claimant's testimony, and other evidence, noting repeated inconsistencies between Plaintiff's various medical records, examinations, and his own reported life experiences. [AR at 34.] The record contains repeated observations of and concerns about malingering when Plaintiff underwent mental evaluations--even if Drs. Nold and Settles conducted examinations where they felt that Plaintiff was not malingering during examinations. [*See* AR at 432, 461.] Whether the

undersigned would agree with the ALJ or not, his conclusion that Plaintiff's credibility was lacking was not error as it is supported by evidence of record. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence."); *Damron v. Sec'y of Health & Human Servs.*, 778 F.2d 279, 281 (6th Cir. 1985) ("Because of the conflict between Plaintiff's testimony and the report of her attending physician as to the limitations on her activities, substantial evidence supported the ALJ's refusal to accept plaintiff's testimony.").

As an example, the ALJ observed that the Plaintiff reported blacking out three times per month during the hearing but reported blacking out 1-2 times per day to Dr. Settle. He has pointed to no evidence that he had ever complained of blackouts or seizures to other medical providers and, in fact, denied suffering seizures to providers on at least two occasions [AR at 539, 631]. There is no record of any witnesses to blackouts or seizures. Nor, to the extent that Plaintiff claims that these blackouts and seizures arose as a result of brain damage sustained in a 2009 car accident, can he point to any medical report to substantiate his claim of brain damage. Further, Plaintiff maintained a driver's license and continued to drive a

car. [*Id*.] Certainly, he might have done so in an exercise of poor judgment, but the ALJ was not in error when he took the fact that Plaintiff maintained a license and drove a car into consideration.

With regard to Plaintiff's physical impairments, medical assessments and evidence repeatedly conflicted with what his stated conditions and limitations were. For example, Plaintiff represented to examining physicians that not only did he sustain a brain injury as a result of the March 2009 automobile accident but that he also suffered a broken vertebrae. There is no evidence obtained from medical testing of either injury. While Plaintiff stated that he would have difficulty lifting anything heavier than a coffee cup, no physician who examined him concluded or even suggested that such a limitation would be necessary. X-rays of his knees revealed no problems. His grip and ability to manipulate items was repeatedly assessed to be unremarkable, although there was agreement that his ability to lift overhead would be restricted in some way. It comes as no surprise that a February 17, 2010, review by a non-examining agency physician concluded that he could frequently lift 10 pounds. [AR at 426.] Similarly, a September 6, 2012, review found that Plaintiff should be able to engage in activities including lifting. [AR at 497.]

The evidence of record supports the ALJ's conclusion that Plaintiff's reported symptoms (extreme pain and extraordinary physical limitations) in conflict with the daily activities he reported being able to accomplish: driving a car, riding a lawn mower, and feeding his mother's cats. [AR at 65-66.] Moreover, the evidence shows that he has done little to address his subjective complaints of pain, including what would have to be excruciating pain in his knees if one believed his testimony evaluating that pain at the highest possible level on a scale of one to ten. After the therapy that he received following his March 2009 accident, from which he was discharged for meeting his goals, there is no evidence that he ever sought or attended physical therapy or received injections to relieve the pain he claims to suffer in his knees. The record contains some evidence that he was prescribed an assistive device (a walker) in 2014 due to weakness in his legs, but there is no detailed evidence concerning the physical situation which warranted such a prescription or the type of examination which resulted in the decision that an assistive device was necessary. [AR at 79.]

In other words, the ALJ did not err when he concluded that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. While Dr. Nold based his opinion that Plaintiff had back, shoulder, neck, knee, and ankle pain, as well as dementia, in

part, on a physical examination of the plaintiff, he relied in large part on Plaintiff's self-reported history. Plaintiff's own account is one of extreme pain and physical and mental limitations, some of which was supported but some of which are not. As for Dr. Settles' report, which represents the only evaluation of Plaintiff's mental and intellectual functioning of record which is not marred by the conclusion that Plaintiff was malingering during the assessment, the ALJ adopted her assessment of Plaintiff in his assessment of Plaintiff's residual functional capacity. She concluded that, based on testing, Plaintiff's full scale I.Q. of 67 was indicative of extremely low intellectual function but assessed him with Borderline Intellectual Functioning because of his good adaptive functioning. The ALJ accepted this assessment and listed borderline intellectual functioning as one of Plaintiff's severe impairments for the purposes of evaluating his claim. Thus, the ALJ did not err in his evaluation and use of the opinions of the examining agency physicians, Dr. Nold and Dr. Settle, in light of the evidence in the record. [AR at 35.]

**B.**

The Court also rejects Plaintiff's argument that, in light of Dr. Settles' remarks and assessment, the ALJ should have concluded that Plaintiff was disabled under listing 12.05C or 12.05D due to mental impairment. This listing contains an

introductory paragraph with the diagnostic description for disability, along with four sets of criteria. 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(A). If the claimant's impairment satisfies the diagnostic description and any one of the four sets of criteria (A through D), a claimant's impairment will meet the listing. [*Id.*] Under the introductory paragraph, intellectual disability refers to "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before the age of 22." 20 C.F.R. pt. 404, subpt. P, app. 1 §12.05. Listing 12.05C requires that the claimant exhibit a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. Listing 12.05D requires that the claimant exhibit a valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following; (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of extended duration.

The ALJ acknowledged the full scale IQ score of 67 assessed by Dr. Settle, which indicated an extremely low range of mental functioning. [*See* AR 30, 650.] However, the ALJ concluded that Plaintiff's condition, while severe, did not meet or equal the either listing because his full scale IQ score was not accompanied by clinical findings that met or equaled in severity those in listing section 12.05C nor those in 12.05D. [AR at 30-31.] Specifically, the ALJ relied upon Dr. Settle's observation that Plaintiff had borderline intellectual functioning, instead of mild retardation, due to good adaptive skills.[7] [*Id.*] Dr. Settle based this conclusion on Plaintiff's reported ability to engage in activities of daily living, including driving and paying bills, which were also apparent to the ALJ and others in the evaluation process. Indeed, the ALJ noted Plaintiff's testimony at the administrative hearing that he could and did mow the lawn, feed his mother's cats, and take care of some of his personal hygiene. [AR at 65-66] He also observed that there was evidence in the record that Plaintiff had displayed good insight and reasoning on multiple occasions with other medical

---

[7] The Court is mindful that Dr. Settle stated that Plaintiff did not exhibit evidence of malingering during testing. That said, other examiners noted malingering by Plaintiff on other tests meant to determine his cognitive function. [AR at 432.] The Court notes this only to point out that the ALJ had an entire body of evidence upon which to rely in which various examiners had indicated doubt as to any results which would have demonstrated even lower function than that identified by Dr. Settle.

professionals, as well as in Plaintiff's conduct in an ongoing criminal case against him. [*See* AR at 30-31, 34, 650.]

Plaintiff has pointed to no evidence of record which would have supported the conclusion that he lacked this adaptive functioning or that he experienced marked restriction of his activities of daily living, marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. Even assuming that the ALJ might have reached a different conclusion about Plaintiff's residual functional capacity from the evidence of record, that is not enough to render the ALJ's conclusion an error. Plaintiff disagrees with the ALJ's conclusion drawn from the evidence about his capacity to do work, but he has demonstrated no error.

**V.**

In summary, the ALJ properly considered evidence contained in the record, and there was sufficient evidence to find that Plaintiff was able to perform simple light work. For all the reasons stated above, the decision rendered by the ALJ and adopted by the Commissioner shall be affirmed.

Accordingly, **IT IS ORDERED:**

(1) That the Plaintiff's motion for summary judgment [Record No. 12] shall be, and the same hereby is, **DENIED**; and

(2) That the Commissioner's motion for summary judgment [Record No. 13] be, and the same hereby is, **GRANTED**.

This the 27th day of September, 2016.

Signed By:

*Joseph M. Hood*

Senior U.S. District Judge